Filed 4/24/26  In re B.A. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re B.A. et al., Persons Coming Under the Juvenile Court Law. | B346601 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. S.A., Defendant and Appellant. | Los Angeles County Super. Ct. Nos. 24CCJP00479A, 24CCJP00479B, 24CCJP00479C |

APPEAL from orders of the Superior Court of Los Angeles County, Mark A. Davis, Judge.  Affirmed in part, dismissed in part.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

Mother appeals from the juvenile court's orders made at the 12-month review hearing as to her three children. She argues the court erred when it (1) found the children would be at substantial risk of detriment if returned to mother and ordered they remain in their placement; and (2) found the Los Angeles County Department of Children and Family Services (DCFS) had provided mother with reasonable services under Welfare and Institutions Code section 366.21.[1] As the children have since been returned to mother's custody, we conclude mother's appeal as to the court's suitable placement order is moot. We conclude substantial evidence supported the court's reasonable services finding and affirm the court's orders.

## BACKGROUND

### 1.   *The family*

The family consists of mother, father (who is not a party to this appeal), and their three children B.A. (born in 2011), M.A. (born in 2013), and J.A. (born in 2015). Parents are not married and live in separate homes in Apple Valley, a town in San Bernardino County. Mother was diagnosed with schizoaffective disorder when she was 18 and has a history of mental health hospitalizations.

The family has a prior child welfare history. In May 2013, the juvenile court in San Bernardino County sustained a dependency petition finding B.A. was at substantial risk of neglect and harm due to mother having a mental health condition that interfered with her ability to care for the child. That court terminated its jurisdiction in September 2014 and issued a family

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise noted.

2

law order granting mother sole physical custody of B.A. and M.A. and both parents legal custody.  Over the years, several reports of general neglect were made about the family that were deemed unfounded or inconclusive.

**2.    *Section 300 petition***

On February 13, 2024, DCFS filed a section 300 petition on behalf of the three children, who were staying with their adult half-sibling April and her husband Aaron in Los Angeles county. The petition alleged parents had medically neglected and failed to provide the children with regular education instruction, and mother was incapable of providing regular care and supervision of the children due to:  her history of mental and emotional problems, including a diagnosis of schizoaffective disorder; her symptoms of depression, paranoia, suicidal ideation, and auditory hallucinations; and her failure to take psychotropic medications as prescribed and to participate in mental health treatment.

In October 2023, parents had asked April (father's daughter) to care for the children because mother was suffering from depression and hearing voices.  Father was unable to care for the children due to his own health issues.  Mother didn't communicate with April "for weeks due to ongoing psychiatric hospitalizations."

When the children arrived at April's home, the children were "disheveled," had no schedule, could not "complete daily living tasks" independently—such as getting dressed, and had extreme delays in their speech, motor and cognitive skills, and "health."  April also had learned from the children that they had not been to school for more than three years.[2]  In December 2023,

---

[2]    Mother had home schooled the children since Covid.  In her words, it "didn't work."  J.A. never had been to school.

mother had asked April to return the children—she was worried she'd lose her home if she lost the funding she received for the children. April and Aaron convinced parents to let the children stay. Parents gave April and Aaron authorization to make medical and educational decisions for the children.

On January 4, 2024, April took the children to the pediatrician.[3] Mother went to the pediatrician's office to sign the paperwork but did not stay for the children's appointment. The pediatrician was concerned about neglect as the children had "speech delays, gait challenges, sensory challenges, audiology concerns, tinnitus, high cholesterol, and high blood pressure." The children were referred to behavioral and mental health services, neurology, audiology, occupational therapy, speech therapy, physical therapy, and for ADHD/autism evaluations.

April enrolled the children in school the second week of January 2024. The children were improving in April and Aaron's care. Mother had calls with the children most evenings. Parents had monitored visits with the children on Saturdays and Sundays.

In its jurisdiction/disposition report filed March 26, 2024, DCFS described the children as "hav[ing] demonstrated failure to meet necessary milestones in areas such as speech, motor, social, emotional, and cognitive development or independent skills." There also were "gaps in [the] children's learning." DCFS noted the children had "present[ed] with extreme delays" in several areas. DCFS described parents as having "a chronic pattern of

---

[3] Mother had not taken the children to the doctor since August 2022, and she had last taken the children to the dentist more than a year earlier.

4

neglecting their children's needs." DCFS concluded mother "lack[ed] regular and consistent medication compliance to manage her symptoms, which has been the case for many years, as evident by DCFS referral history." The report continued, "Though [mother] regularly makes her own protective plans for her children to go with family when she is experiencing . . . symptoms, [mother]'s mental health has impeded her from meeting the needs of her children, including access to regular medical and dental visits, developmental and behavioral services, and education." DCFS was concerned that "both parents appear[ed] to lack insight and minimize[d] their children's developmental delays and mental health issues" and believed it was unsafe for children to return to either parent.

In May 2024, the juvenile court sustained the petition and assumed jurisdiction over the children, removed the children from parents' care and ordered them suitably placed, and granted reunification services to parents. Mother's case plan included participation in parenting classes, individual counseling to address mental health issues, mental health counseling and taking all prescribed psychotropic medications, conjoint counseling with the children if recommended by their individual therapists, and three-hour monitored visits three times each week.[4]

---

[4] Mother filed an appeal from the court's jurisdictional findings and disposition orders. This court dismissed that appeal after mother's counsel filed a brief under *In re Phoenix H.* (2009) 47 Cal.4th 835, 844, and mother did not notify the court of any contentions that she believed the court should consider. (*Id.* at p. 838.)

5

### 3.    *Six-month review period*

According to DCFS's status review report filed October 17, 2024, the children had made "tremendous progress" in April's and Aaron's care.  They were attending in-person school, extracurricular activities, and church.

The children had been receiving medical services at Olive View Medical Center, but their medical care was being transferred to Children's Hospital Los Angeles (CHLA) where they could receive more services at one facility.  At Olive View, B.A. received weekly physical therapy, she and M.A. both had EEG tests showing abnormalities, and J.A. had been diagnosed with an eustachian tube dysfunction that affected his ability to eat.  All three children were being evaluated for IEPs due to signs of autism.  B.A. had received mental health services since June 2024 to address her anxiety from suffering neglect and recently had begun weekly, individual counseling; M.A.—due to facility scheduling delays—hadn't begun his weekly therapy sessions until July 25, 2024; and J.A. was on the waitlist.

In September 2024, the social worker conducted a home assessment of mother's home in Apple Valley.  There were many animals in the home, it had a "foul odor," and the floors were "very dirty."  Mother agreed to change the cat litter and clean the floors.

DCFS reported that mother had been complying with her case plan.  She had received a certificate of completion for her parenting class but continued to attend class.  Mother said, " 'The parenting classes have taught me the tools to get closer to my children and understand them.' "  Mother stated she understood "the mistakes she made," and she was glad the children were receiving the services they needed and would

"assure that they continue to receive those services when and if the children return to her care." Mother began individual counseling in May 2024. On October 2, 2024, mother's therapist told the social worker that mother had been "mentally stable, ever since she started services with her." The therapist was working with mother on "how to stay motivated to get tasks completed." The therapist planned to do a full assessment of mother's home and give her feedback on how to make it suitable for her children. She also had been teaching mother about nutrition and suitable meals for the children, instead of fast food. The therapist stated mother "has shown commitment to her case plan and is trying to do what is needed to reunify with her children." Mother also was under the care of a psychiatrist. She was taking all her prescribed medications and receiving a monthly injection.

Visitation had been challenging due to the children's school schedule, the fact parents lived about 100 miles away from April's home, and that mother was unable to drive long distances on the freeway. The family agreed to weekend visits, with a monitor transporting the children. Mother and father also had FaceTime calls with the children three times a week from 7 p.m. to 8 p.m. Mother was on time and prepared for visits. The social worker had observed mother was appropriate with the children and stayed engaged with them as she watched them play. The social worker also observed mother "redirect the children when they were misbehaving." DCFS liberalized visitation in September, giving mother two hours of unmonitored and two hours of monitored visitation. The children said they enjoyed their time with parents. They wanted to reunify with mother.

In a "Reunification Assessment," however, the same social worker reported mother had been observed to "lack[ ] focus" and "lack[ ] empathy for the children" during visits. Mother had "not show[n] that she is attuned to the [c]hildren's physical or emotional needs." She did not "demonstrate acts of protection and supportive behaviors during visitation" and "struggle[d] to show the ability to reinforce appropriate roles and boundaries for the children." Mother "often required prompting from the visitation monitor."

At the November 1, 2024 six-month review hearing, DCFS recommended the court continue family reunification services for parents. Counsel noted mother was "in full compliance" and "doing very well with her case plan" but stated DCFS still had concerns about the children's safety in her care. Mother's home "still had multiple animals and had a foul odor," and she still had not shown she was "in tune to the physical and emotional needs" of the children during visits. Minors' counsel asserted the children had "serious medical conditions that need[ed] to be attended to before they [would be] ready to return" to mother's home. The court questioned counsel about DCFS's safety concerns given mother's progress. Counsel explained DCFS did not have "substantive evidence" that mother would be able to meet the children's special medical needs "at this point." Counsel further explained that, although mother could not drive to the children's appointments in Los Angeles, rescheduling their appointments closer to her home would delay the children's diagnoses and medical care. Counsel clarified it "certainly is not [DCFS]'s position the children can never return home."

The court continued parents' reunification services but declined to return the children to mother "in light of health

8

conditions and the appointments set up." The court ordered DCFS to provide mother with overnight visits on one weekend night, once a week for a month. If there were no issues, DCFS had discretion to increase mother's overnight visits. Overnight visits were to begin "once the odor and pet issues ha[d] been resolved."

### 4. *12-month review period*

On April 14, 2025, DCFS filed its status review report for the upcoming 12-month review hearing. Mother's home now was clean and odor-free. According to mother, overnight visits were going well, and she was "actively implement[ing] the parenting skills" she had learned. Mother prepared "homemade meals" for the children and occasionally took them out to eat when they asked. B.A. wanted to return to mother's home after she finished middle school. Her brothers wanted to visit parents only on the weekends. They loved their parents but wanted to continue to live with their caregivers where they felt safe and happy.

On April 7, 2025, during a call from the social worker, B.A.'s therapist said B.A. had "started opening up more" than she had in her earlier sessions. They were beginning to build a "strong [rapport] and therapeutic bond." B.A. was "making a lot of progress," and the therapist expected her "to continue improving." In January, B.A.'s pediatrician also had referred her to "trauma focused cognitive behavioral therapy."

M.A. continued to suffer from "focal seizures," as well as asthma and allergies. He was to have another EEG and MRI. His next neurology appointment was scheduled for June. On April 8, the social worker spoke to M.A.'s therapist who said M.A. also had "been opening up more during therapy." He was

9

"doing very well and continue[d] to make positive strides in the therapeutic process."

J.A. was to have a tonsillectomy. J.A. had had a neurology appointment on February 10, 2025, and an EEG on March 14. The social worker attempted to speak with J.A.'s therapist, but the therapist did not return her call. The caregiver said J.A. was participating in therapy and "progressing well."

A child and family team (CFT) meeting was held on February 19, 2025, consisting of DCFS staff, the caregivers, parents, and mother's therapist. The group discussed several "[w]orries." The caregivers discussed the children's medical and behavioral issues. They said the children's medical providers "refer[red] to the children['s] extreme neglect and trauma" as the reason their "current needs [were] so high risk," including "self-harming, choking, and escalating behaviors." The caregivers also were "extremely worried" about B.A.'s behavior —she intentionally hurt her brothers and showed no remorse. The caregivers also discussed the boys' history of self-harming. J.A. had hit his head up until two months after his detention, and M.A. had confided to April that he had cut his arms while mother slept. The team also discussed concerns about mother's ability to recognize when one of the children was in "grave need of attention, when having seizures, choking, and demonstrating escalating behaviors."

Because the children's medical care had been transferred to CHLA, their medical appointments now were delayed. Mother wanted to be part of the doctors' visits, but they were too far away for her to attend. She had tried to call during medical appointments, but the calls were not "clear." The caregivers said they had offered to pay for mother to take an Uber to CHLA to

attend the children's appointments, but mother wouldn't "accept the help she is offered." Mother also was worried about missing her overnight visits if DCFS couldn't transport the children. Due to her anxiety, mother couldn't drive to pick the children up. Mother's therapist also was concerned that, if the children had to be driven to CHLA, mother wouldn't be able to do that.

The team also discussed various "[f]amily [n]eeds," including, among others, "[t]he children need to have [the] opportunity to address case issues in a therapeutic setting"; and "parents need to be child specific medically trained for the care of the specific needs of the children," "attend medical appointments[,] and participate in child [s]pecific medical training." The team developed and agreed on a case plan for one "need" identified as: "Parents going to children's specialists and getting child specific training for each of the children." Parents were to "focus on specialists first." The social worker was to "provide the Child Specific Training confirmation form to parents so that they [could] have [the forms] signed off by specialists when they attend." The caregivers were to "provide information as to the upcoming appointments in time for the Team to support and explore transportation options for the parents." The social worker gave CHLA the documentation it required to show parents still had rights.

DCFS reported that, since the February CFT meeting, the children had not had any in-person, specialist appointments. There was an upcoming appointment for the boys on June 2, 2025 at CHLA. Mother had been prepared to participate in a telephonic follow-up appointment with B.A.'s pediatrician on March 6, but the provider could not "accommodate" a call from a separate line.

11

On April 7, 2025, the social worker spoke with mother's therapist. The therapist confirmed mother remained mentally stable and was taking her prescribed medications. Mother had been "learning and applying new skills, such as preparing homemade meals, in preparation for reunification with her children." Mother also had been keeping her home clean and was "very mindful to maintain it, ensuring it [did] not return to its previously unkempt state." The therapist noted mother had reported that "she does not hear voices anymore." Earlier, in January 2025, the social worker spoke with mother's psychiatrist. He stated mother was "expected to remain stable as long as she continues to follow her prescribed medication regimen and attend her monthly appointments" to receive a prescribed, monthly injection.

Mother (and father) had had consistent virtual visits with the children during the week and in-person visits on the weekend. On February 1, 2025, mother began weekly, overnight visits with the children. The social worker drove the children from the caregivers' home to mother's home on Saturdays and drove them back the next day. The social worker observed the children were excited when they went to eat with parents at a restaurant. The report stated the social worker had "observed and assessed that mother is still in process of getting accustomed on how to attend to all the children['s] medical needs." The social worker stated mother "always appears scared when she needs to attend to the children['s] needs." B.A. told a different social worker she enjoyed spending time with parents and "loves being at her mother's home because her mother is 'less strict' compared to the caregivers." M.A. and J.A. enjoyed their visits with mother, but during "one-on-one conversations" with the same

12

social worker "both boys became emotional and cried, repeating that they only want to continue visiting their parents and do not wish to be forced to live with them."

DCFS determined the risk to the children was "high" if returned to parents' care at that time. DCFS found it was "not yet appropriate to transition the children to mother's care due to concerns" that M.A. and J.A. could self-harm "if they were sent to live with the mother again." DCFS explained the children's "medical, developmental, and mental health needs require ongoing caregiver attentiveness, advocacy, and coordination with medical and educational providers to ensure appropriate support and safety for each child." DCFS summarized those needs: B.A. had language delays, processing challenges, and memory deficits, had an IEP for dyscalculia, and was performing at a kindergarten level in math; M.A. had hypoglycemia and seizures, required careful management of his diet and close monitoring for mental health changes, and used an inhaler; and J.A. had fine and oral motor delays, sleep apnea, developmental delays, and possible apraxia, had an IEP for stuttering, and was to have a tonsillectomy and adenoidectomy with follow-up studies.

Although mother had complied with her case plan, DCFS had concerns about "the safety of the children and the effects of returning them to their mother's care due to [J.A.'s] and [M.A.'s] continued reiteration that they do not want to return to live with [m]other." DCFS also noted mother had "yet to receive child specific medical training that was recommended to her during the CFT[ ] [meeting] for [J.A.] and [M.A.] to be well aware of their medical needs and treatment that she would have to follow-up

13

with to maintain their health and safety." DCFS thus recommended that the court continue reunification services.

In a last minute information filed May 19, 2025, DCFS reported on parents' virtual visits. The caregiver said parents demonstrated "emotional warmth and affection toward the children during visits," such as saying, " 'I love you.' " Parents' interactions, however, were "superficial," and "lack[ed] consistent structure or engagement." The caregiver was concerned that, "while the parents care for the children, they do not appear to fully understand or respond to the children's physical, medical, or psychological needs, particularly during moments requiring immediate or informed action." During both in-person and virtual visits, M.A. had "exhibited signs consistent with seizure activity," but parents had "failed to take appropriate steps, such as engaging [M.A.] to assess his awareness or following medical protocols" that had been shared with parents. According to the caregiver, parents also had overlooked symptoms indicating M.A. or J.A. might need their inhalers. The caregiver believed parents "appear[ed] unprepared or inconsistent in responding to the children's more complex physical and emotional needs, particularly in situations requiring medical judgment or emotional regulation."

5.      *12-month review hearing*

Mother submitted a declaration to the court in anticipation of the May 1, 2025 12-month review hearing. On February 20 and 24, 2025, April had shared with mother a " 'Google Doc' " listing the children's upcoming appointments. Mother declared she called CHLA on February 24 to speak to one of the doctors about the children but was told CHLA "will only contact one person, the caregiver, during these calls [and] . . . does not

14

facilitate three-way calls." Mother declared that, between February 24 and April 1, she called "multiple medical providers" to obtain the children's medical records, but many of them told her the caregiver would have to provide authorization to release the records. Mother declared she followed up with the social worker on April 3 and 7 about having April authorize the release of the records to her.

The May 1 hearing was continued for a contested hearing on May 22. The court admitted DCFS's exhibits and mother's declaration and exhibits into evidence. Mother also testified. She generally described each child's medical issues. She testified she had learned to use M.A.'s glucose monitor by watching videos and through April's demonstration. April also had had mother practice with it on M.A. once. Mother had not yet participated in the children's medical appointments. She had asked to participate in telephonic appointments, but the providers would call only one person, and April was afraid she'd accidentally be disconnected if she tried to make a three-way call with mother. Mother confirmed she'd been offered transportation to the children's initial in-person visit at CHLA, but she didn't go because she wasn't "prepared" to stay overnight. The reporter's transcript reflects mother then said, "You won't be going on June 2."[5]

Mother testified she was participating in individual counseling once a week, was seeing a psychiatrist and taking all prescribed medication, had attended approximately 35 parenting

---

[5]     This appears to be a mistranscription. Later, mother testified she did not go to the first appointment at CHLA because she didn't have anyone to watch her dog, but she no longer had that dog.

15

classes, and had maintained a clean and odor-free home for "[a]t least six months." Mother answered "no" when her counsel asked if the social worker had "helped you to start counseling with the children." Counsel asked about mother's plans if the children were returned. Mother planned to enroll them in their pre-Covid school. As for the children's medical appointments, the children's insurance included transportation that mother could use to take them to appointments in her area. Mother also had investigated extracurriculars in her area for the children to attend.

DCFS's counsel asked mother to describe some of M.A.'s symptoms when he "starts to experience a seizure." She did but testified she hadn't seen M.A. exhibit any symptoms during her visits. When asked about a video visit during which M.A. had a seizure, mother stated it was "very hard to see exactly what's going on," as she and father shared her phone for video calls. She didn't see M.A. having a seizure at the time. Counsel also asked if M.A. ever had signs of low blood sugar and how mother had responded. Mother stated that once—during a monitored visit at a trampoline park—M.A. said he felt his blood sugar might be low. He tested it and it was in the normal range, so "he put his head down on the table and waited it out until part of the visit was over." As for J.A., mother testified she gave him his inhaler as instructed when it was sent with him. She observed J.A. to have difficulty breathing only once.

In terms of what she had done to improve her understanding of the children's medical care, mother testified she had discussed their medical needs with April and looked over their health care "passport[s]." She also had tried—unsuccessfully—to get the children's medical records from CHLA.

Counsel also asked mother to describe the types of doctors the children needed to see. Mother responded, "[n]eurologist," an "ear, nose and throat doctor" for J.A., the pediatrician, and the children had counseling and physical therapy. She wasn't sure about other specialists.

Mother was aware the boys had stated they were not ready to return home. Their counsel asked mother if she were "willing to respect their wishes and perhaps start with conjoint counseling before having them" return. Mother was "willing to do that."

B.A.'s counsel called the caregiver April as a witness. April testified that for the initial CHLA appointment, she and her husband had offered to pick parents up, drive them to Los Angeles and pay for their hotel stay, take them to the children's medical appointments and to see the children's teachers, and to drive them back home. Parents declined. April stated mother said she had to take care of her dogs. All three children had upcoming neurology appointments on June 2 at CHLA: to go over B.A.'s results of her EEG and MRI,[6] to determine if M.A.'s seizures were related to his hypoglycemia or PTSD, and to rule out seizures or anything else that could be "impacting [J.A.'s] cognition." J.A. also had trouble breathing at night and was choking on his food due to difficulties swallowing. April still was waiting to hear from the surgeon about scheduling J.A.'s tonsil removal. April testified she was concerned that mother wouldn't be able to recognize M.A.'s seizure or low blood sugar symptoms. She had the same concern with respect to J.A.'s difficulty breathing at night. She and Aaron had to prop up J.A.

---

[6] B.A. also had several referrals in other areas for which she had upcoming assessments.

17

and give him medication when they heard him trying to catch his breath in the middle of the night. April wanted the children to finish their pending medical appointments to determine their diagnoses before they returned to mother.

B.A.'s counsel joined in DCFS's recommendation to continue reunification services. Counsel acknowledged mother had completed her case plan and "made great accomplishments." Counsel "would have liked to have seen . . . parents participating meaningfully in [B.A.'s] care and in their medical and therapeutic appointments." Counsel noted mother had neglected B.A.'s "medical, behavioral, and developmental issues and still hasn't participated in these appointments." Counsel acknowledged mother's failure to participate wasn't always her fault, but as she had not, the children remained at risk. Counsel noted the social worker had given mother a "form that needed to be signed" by B.A.'s doctors but that hadn't been done.

The boys' counsel joined in B.A.'s counsel's argument. Counsel further argued that, as mother had not been to the boys' medical appointments—and had not "observed any of these very concerning medical issues with respect" to M.A. and J.A.— counsel didn't believe she was "educated with respect to how serious and significant their medical concerns are." Counsel also commended mother's progress and compliance with her case plan but argued the emotional well-being of the children must be considered. Counsel noted the boys had made "detailed statements . . . about how strongly they feel about not going home to mother at this time." Counsel asked that the court continue reunification services and "that we get conjoint counseling."

Mother's counsel asked the court to make a "no reasonable services finding" and to release the children to mother. Counsel

18

argued the social worker had "not made any efforts to follow up with any of mother's providers." She argued DCFS "failed to give any services to [mother] in the last six months" other than visiting mother's home once a month. Counsel noted the court had ordered conjoint counseling as part of mother's case plan, but there were "no recorded attempts to inquire with the minors' therapist about their readiness to participate in conjoint counseling." Counsel asserted mother's "testimony clearly demonstrated her increasing insight as to (A) what brought this case here in the first place and (B) what she needs to do going forward to ensure that the children's education and medical needs are met." Counsel queried, "If we do not send them home for mother to have time to observe these medical behaviors, how will she ever learn?" Counsel reiterated there had "been no efforts made to get these people into conjoint counseling to ameliorate these issues."

DCFS's counsel argued DCFS had provided reasonable services. Counsel noted the social worker "made regular, consistent contact with the parents," and went to mother's home and assessed it. Counsel argued that any failure on DCFS's part to "not follow up with [mother's] service providers" "would really only be a problem if [DCFS] was arguing that mother's service[s] had not been completed." DCFS, however, conceded "mother has done very well in her case plan." Counsel argued the concern was not about whether mother had "done programs" but "whether or not these children can be safely returned to her care."

Counsel noted "[m]other has not done the child's specific medical training that's needed to safely meet these complex needs." Counsel also noted mother had not attended the children's in-person medical visits. Counsel acknowledged

mother had said she'd reached out and was prevented from participating, but to counsel's "mind," that wasn't "enough." Counsel argued the court should "continue reunification services for mother, allow her an opportunity to participate actively in all the children's medical appointments. If she can demonstrate she can do that, then the court would be in a better position to order return, but at this time it is [DCFS]'s position that she's not capable of doing that."

The court stated, "The only negative thing I see is that there's medical training for the children's needs that was not necessarily in [the] order that require a bit more time because the needs are so significant for these kids." The court noted it "would be very comfortable if mother had opportunity [*sic*] to go to more appointments, see what's going on." The court continued, "I would like mother to participate meaningfully in the appointments. That's been an issue because very frequently [April] did not really say she was necessary to go to some of these appointments, but the ability to recognize the symptomology for the kids that are choking at night. They cannot breathe. They are behind in school. [They] have gross motor skill issues. Those things are important." The court noted the boys had associated suicidal ideations with the idea of return that the court "absolutely needs to consider." The court commended mother for all she had "done" and "encourage[d] her to go further."

The court found return to mother would create substantial risk of detriment to the children's physical or emotional well-being. The court ordered further family reunification services "as appropriate" and that continued jurisdiction was justified. The court asked DCFS to assist mother "to get to these doctor

20

appointments and allow her to be prepared when we return for a 22 hearing." The court explained,

> "This was a close call; but in light of the potential detriment and physical well-being of the children and their health conditions, I think a little more time. [¶] It is important that mom have an opportunity to be at these appointments to see more of the kids, to see what people are saying so all parties [*sic*]. It could be easy as [mother's counsel] said. She really does not see and cannot recognize what's going on well. The kids are not with her, so it's tough for her to make that determination. [¶] I ask all parties allow mom to visit the kids frequently. I encourage mom to go to appointments. I know she's gotten rid of the dog, so there's no excuse why mom would not be at every appointment she can be at just to make sure she's in the loop. All these conditions sound very scary to me, and I want mom to be on top of everything going on. [¶] I think she has an idea but not as firm as I would like her to have before the kids can return."

The court ordered DCFS to work with mother and the caregiver to put together an overnight schedule for the children to visit mother during the summer. The court also ordered DCFS to contact the children's therapist about "the appropriateness of conjoint counseling." If the therapist recommended it, the children were to begin conjoint counseling with mother "forthwith." DCFS was to assist the children and mother with transportation to therapy, medical appointments, and visits.

21

The court found DCFS had "complied with the case plan by making reasonable efforts to return the child to a safe home and to complete any steps necessary to finalize the permanent placement of the child."  The court found by clear and convincing evidence that returning the children to mother's physical custody would create a substantial risk of detriment to the children, "creating a continued necessity for and appropriateness of the current placement."  The court set a review hearing for November 18, 2025.  Mother appealed.

## DISCUSSION

1. ***Mother's challenge of the juvenile court's suitable placement order is moot***

"A case becomes moot when events ' "render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant [the plaintiff] any effect[ive] relief." ' [Citation.]  For relief to be 'effective,' two requirements must be met.  First, the plaintiff must complain of an ongoing harm.  Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*)) [" 'the critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error' "].)  "A reviewing court must ' "decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding." ' " (*Ibid.*)

Part of mother's appeal challenges the juvenile court's orders made at the 12-month review hearing finding return of the children to her custody would be detrimental and ordering the children remain suitably placed.  While mother's appeal

22

was pending—at the 18-month review hearing held on December 15 and 30, 2025—the court terminated its suitable placement orders and ordered the children be returned to parents' custody on the condition that they live with mother.[7]  DCFS contends mother's challenge to the suitable placement orders is thus moot.

As the children have been returned to mother's care, a reversal of the suitable placement orders and remand of the matter would have no practical effect.  Accordingly, we can grant mother no effective relief as to this portion of her appeal.  Nor will the now-superseded suitable placement orders have any legal or practical effect on a future proceeding; mother does not claim they will.  The issue thus is moot.  Mother has not asked us to exercise our inherent discretion to reach the merits of this moot part of her appeal.  (*D.P., supra*, 14 Cal.5th at p. 282.)  We decline to do so and dismiss mother's appeal as to the suitable placement orders as moot.

2.    ***Substantial evidence supports the juvenile court's reasonable services finding***

a.    *Governing Law and Standard of Review*

"When a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family."  (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624 (*Michael G.*); § 361.5, subd. (a).)  Reunification services " 'enable [parents] to demonstrate parental fitness and so regain custody of their dependent children.' "  (*Michael G.*, at p. 624.)  At each review hearing, if the child is not returned to the parent, the juvenile court must determine

---

[7]     We took judicial notice of these orders on DCFS's request. (Code Civ. Proc., § 909; Evid. Code, §§ 452, subd. (d)(1), 459.)

"by clear and convincing evidence whether reasonable services that were designed to aid the parent . . . in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent." (§ 366.21, subd. (e)(8).)  Generally, "to support a finding that services were reasonable, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' " (*Michael G.,* at p. 625, fn. 6.)

"Reunification services should be tailored to the particular needs of the family."  (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001 (*A.G.*).)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547; see also *In re A.O.* (2025) 111 Cal.App.5th 1048, 1062 (*A.O.*) [" 'The adequacy of the reunification plan and of the [D]epartment's efforts to provide suitable services is judged according to the circumstances of the particular case.' "].)

We review the juvenile court's reasonable services findings for substantial evidence.  (*A.O., supra*, 111 Cal.App.5th at pp. 1061–1062.)  " 'In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof.' " (*Id.* at

24

p. 1062, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) In making this assessment, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

  b. *Application*

  Mother contends DCFS did not provide her with reasonable services during the review period between the six-month and 12-month review hearings. She argues DCFS failed (1) to follow up with the children's therapists to determine if conjoint counseling could begin; (2) to follow up with mother's medical providers about her progress in treatment; and (3) to ensure mother received child specific medical training.

  As mother acknowledged, the problems that led to the removal of the children stemmed from her inability to care for them properly due to her mental health diagnosis, resulting in her neglect of their medical care, education, and behavioral and developmental issues. Mother's case plan included her participation in a parenting program, individual counseling, and mental health counseling; an order that she take all prescribed medications; and monitored visitation. The children were to have individual counseling, and DCFS was "to provide [them] with conjoint counseling if recommended by an individual therapist."

  It is undisputed mother was in full compliance with her case plan and was having regular virtual visits with the children during the week and in-person day and overnight visits on the

weekends. The social worker visited mother's home each month and had assessed it. Mother nevertheless argues DCFS hadn't contacted her medical providers about her progress in treatment since October 2024, the end of the six-month review period. She contends that, as a result, DCFS could not "adequately assess[ ]" her "ability to regain custody of the children." As DCFS noted in its report filed for the 12-month review hearing, however, a social worker contacted mother's therapist on April 7, 2025. DCFS reported the therapist's statements that mother actively was participating in weekly therapy sessions and was mentally stable, was learning and applying new skills in preparing to unify with the children, was compliant with her medication, and was maintaining a clean home.[8] As DCFS's counsel noted at the hearing, DCFS agreed mother had "done very well in her case plan."

Mother also argues there was no evidence in the record indicating DCFS made any effort to follow up with the children's therapists to see if conjoint counseling with mother could begin. She contends conjoint counseling was critical, as her sons had said they did not want to live with her. Although DCFS was in contact with the children's therapists, mother is correct that nothing in the record shows DCFS asked them about the children beginning conjoint therapy with mother.[9] We do not conclude

---

[8] DCFS spoke to mother's psychiatrist earlier, on January 14, 2025, who stated mother was mentally stable and in compliance with her oral medications and monthly injection.

[9] There also is no indication, as DCFS notes, that any of the children's therapists had recommended conjoint counseling. In April 2025, B.A.'s and M.A.'s therapists told the social worker each child was *beginning* to open up more during therapy.

that lapse constituted a failure to provide mother with reasonable services, however.

Mother testified—when asked by her counsel—that the social worker had not helped her to start counseling with the children. But nothing in the record indicates mother *asked* the social worker about beginning conjoint therapy. As DCFS notes, mother raised the issue for the first time at the 12-month review hearing.[10] (See *In re Christina L.* (1992) 3 Cal.App.4th 404, 416 (*Christina L.*) ["If Mother felt during the reunification period that the services offered her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan."].) Starting conjoint therapy also was not one of the "worries" the team—which included mother and her therapist —discussed at the February 2025 CFT meeting. The team's discussion of "Family Needs" included the children's "need to have opportunity to address case issues in a therapeutic setting." Again, there is no indication that mother or her therapist (or DCFS) discussed asking the children's therapists about conjoint therapy. Indeed, during the meeting, the team *agreed* on a case plan to address only one of the discussed "needs"—parents going to the children's specialists and getting child specific training.

In any event, the children were undergoing individual counseling—as ordered—and being treated for several serious medical conditions that required numerous appointments and diagnostic tests. (April testified each child had about six to 10 appointments each month.) The evidence supports a finding that

---

[10]    Even the declaration mother submitted for the hearing —which the court admitted into evidence—did not mention anything about conjoint therapy. Minors' counsel also did not raise the issue until the review hearing.

—based on the circumstances—DCFS's prioritization of the children's participation in individual counseling and resolution of their medical diagnoses, and mother's participation in their medical appointments and care, was reasonable. Moreover, mother's visitation had not been curtailed because conjoint therapy had not begun.

The circumstances here thus are not at all like those in the cases on which mother relies.[11] (See *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1243–1245 [reasonable services not provided where agency delayed in providing intellectually-disabled mother with individual therapy until 11 months after children had been removed and failed to provide her with, among other services, a referral for anger management, despite anger issues having been a reason for the dependency], disapproved of on another ground in *Michael G.*, *supra*, 14 Cal.5th at p. 631, fn. 8; *In re T.W.-1* (2017) 9 Cal.App.5th 339, 346 [agency did not provide reasonable services to out-of-state father where its initial case plan "failed to identify any service providers and instead placed the burden on [f]ather to locate services"; its updated case plan, filed more than three months after disposition, did not address all issues that had led to the minors' removal or determine whether the identified services would address case issues; and agency set up only one telephone visit for father during the six-month review period].)

---

[11] We do not intend to suggest conjoint counseling between mother and the children is not important—at the hearing the court ordered DCFS to inquire about it and that it should begin if the children's therapists recommended it. We hold only that substantial evidence supported the court's reasonable services finding.

Finally, mother contends the court's reasonable services finding was in error because DCFS did not ensure she received the child specific medical training it had recommended at the CFT meeting. The main impediment to returning the children to mother at the 12-month review hearing was the fact—in the court's words—"there's medical training for the children's needs that was not necessarily in [the] order that require a bit more time because the needs are so significant for these kids." Mother had not been to the children's medical appointments. The court found it was "important" that mother be at the appointments to hear what the doctors were saying, so she could recognize when the children required medical attention. As mother notes, nothing in the record indicates DCFS arranged medical training for her. We conclude substantial evidence supports the court's finding that the services DCFS provided mother to address this issue were reasonable under the circumstances.

First, the children's medical conditions still were being diagnosed and assessed during the review period. Their medical care only recently had been transferred to CHLA. And their next in-person appointment with their CHLA specialists— in part, to go over their EEG and MRI results with a neurologist —was not until June 2, 2025.

Second, the record shows mother had received information on caring for M.A.'s and J.A.'s medical conditions. April had shown mother how to use M.A.'s glucose monitor and had mother practice with M.A.—mother also had watched videos; mother had been instructed to give J.A. his inhaler every four to six hours, which she did; M.A.'s 504c plan outlined "medical protocols" to follow when he showed seizure activity symptoms; and the pediatrician's and school nurse's "medical directives" had been

shared with mother. April also affirmed she had "made efforts to familiarize mother with [the children's] needs." Nevertheless, mother had not responded to M.A.'s symptoms "in a manner consistent" with that guidance, and at a weekend visit, apparently had not asked about M.A.'s "well-being" after he had symptoms associated with low blood sugar. Mother also apparently overlooked M.A.'s and J.A.'s symptoms indicating they might need their inhalers.

The necessity for mother to attend the children's appointments with their specialists and to be trained on each child's specific medical conditions, as mother notes, was raised at the CFT meeting in February. The team discussed concerns about mother being able "to recognize when [a] child is in grave need of attention, when having seizures, choking, and demonstrating escalating behaviors." Mother also had not attended the children's in-person medical appointments because her anxiety prevented her from driving long distances. Although the caregivers offered to transport her to CHLA, and pay for her hotel, mother chose not to go because she had no one to watch her dog.[12]

To address these issues, the team agreed on a case plan for parents to "go[ ] to [the] children's specialists and get[ ] child specific training for each of the children." The team agreed parents would "focus on specialists first." The record shows DCFS provided reasonable services designed to help mother implement that plan. DCFS asked the caregivers to provide information on the children's appointments in advance so

---

[12] The children had had other in-person tests and emergency room or urgent care visits that mother also did not attend.

30

the team could "support and explore transportation options" for parents to get to those appointments. April promptly sent mother a list of the children's upcoming appointments. The social worker also gave CHLA paperwork to demonstrate parents' parental rights were intact. Mother still could not get access to the children's medical records because the caregiver had yet to authorize their release, but mother had informed the social worker about the issue only in early April.[13] As part of the CFT-agreed case plan, the social worker was to provide parents with "the Child Specific Training confirmation form," so they could "have them signed off by specialists when they attend." It is unclear from the record whether the social worker gave mother the form, but—as we said—the next appointment— where mother would need the form—wasn't until June 2.[14]

Although mother reached out to the social worker about her inability to get the children's records after the CFT meeting, there is no indication that she asked for assistance in obtaining medical training. Mother's declaration, signed April 29, 2025, did not mention medical training. Nor did mother's counsel argue DCFS's services were unreasonable because they had not provided her with child specific medical training. (See *Christina L., supra*, 3 Cal.App.4th at p. 416.)

---

[13] The providers also continued to be unable to facilitate three-way calls. That mother could not participate in telephonic appointments unfortunately delayed her ability to get information on the children's conditions directly from their providers. That delay was not due to DCFS, however.

[14] At the hearing, B.A.'s counsel asserted the social worker had given mother "a child specific training confirmation form that needed to be signed by [the children's] doctors."

It makes sense that DCFS would not yet have facilitated medical training for mother, as the team had agreed she would focus on seeing the children's specialists first. Reasonably, mother would have to meet with the specialists to learn what they had to say about the children's conditions before she could understand how to care for those specific conditions. In short, the true barrier to mother being able to understand the children's conditions and recognize their symptoms was the fact that—through no fault of DCFS—she had not yet been to the children's appointments.

In any event—based on the fact mother was to have the specialists "sign[ ] off" on the child specific training confirmation form—it appears that either (1) mother's attendance at the children's appointments—where presumably the specialists would go over the children's specific medical conditions with her —was the "training"; or (2) the specialists had to sign the form to confirm what specific training mother was to receive for each child. Either way, as no in-person medical appointments had been scheduled between the February CFT meeting and the May 2025 hearing, the court reasonably could find DCFS could not assist mother with child specific medical training until she met with the specialists.

Mother argues the record doesn't show DCFS "provided her with resources and referrals to comply with the case plan requirements." She suggests her out-of-county location was the reason. There is nothing in the record to suggest DCFS failed to provide services to mother or it did not provide services due to difficulties caused by the distance between the children's placement and mother's home or mother's inability to drive long distances. Indeed, DCFS staff drove the children to mother's

home and back to their placement for her weekend visits, and DCFS said it would explore transportation options for mother to attend the children's upcoming appointments with their medical specialists. (Cf. *A.G.*, *supra*, 12 Cal.App.5th at pp. 1002–1003, relied on by mother [reversing reasonable services finding where father had been deported and there was no evidence agency assisted father in contacting Mexican social services agency for service referrals or identified any available services that would comply with his case plan requirements; father's statement that he did not need reunification services did not support finding of reasonable services].)

In sum, we conclude substantial evidence supported the juvenile court's finding by clear and convincing evidence that DCFS provided mother with reasonable services given the family's circumstances.

## DISPOSITION

We affirm the juvenile court's May 22, 2025 orders and dismiss as moot the appeal from the suitable placement orders.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, Acting P. J.

We concur:

ADAMS, J.

HANASONO, J.